UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN FLYNN, *et al*

    Plaintiffs,

    v.

DICK CORPORATION,

    Defendant.

Civil Action No. 03-1718
(AK)

## MEMORANDUM OPINION

    Pending before the Court are the Defendant's motion for summary judgment ("Def. Mot.")[20], the Plaintiffs' opposition ("Pl. Opp'n")[25], and the Defendant's reply ("Def. Reply")[27], as well as the Plaintiffs' motion for summary judgment ("Pl. Mot.")[21], the Defendant's opposition ("Def. Opp'n")[24], and the Plaintiffs' reply ("Pl. Reply")[29].  On April 22, 2005, the Court heard oral argument on the parties' cross-motions for summary judgment.

    This is an action brought by the Trustees of the Bricklayers & Trowel Trades International Pension Fund ("IPF" or "Fund"), a multi-employer employee benefit plan under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461 (2005), against the Dick Corporation to collect employee benefit contributions under § 515 of ERISA, 29 U.S.C. § 1145.  The Plaintiffs claim that the Defendant, a general contractor which performed work in 2003 and 2004 on two construction projects in Florida, is bound by the terms of a Florida collective bargaining agreement to make contributions to the IPF, the Florida Pension Fund ("FPF"), the Florida Health Fund ("FHF"), and the Local 1 App. Fund.  The Plaintiffs claim that they are authorized under ERISA to effect collections on behalf of the International

Masonry Institute ("IMI"), the International Union of Bricklayers and Allied Craft Workers ("BAC"), the IPF, the FPF, the FHF, and the Local 1 App. Fund for all covered masonry work performed by the Defendant's employees.

## I.    BACKGROUND

On December 1, 1989 the Defendant signed an "Independent Agreement" ("1989 Agreement") with the Bricklayers and Allied Craft workers Local 3 Massachusetts for work performed by the Defendant in the geographic area of the Local 3 union.  On September 20, 2000, the Defendant signed an "Independent Agreement" ("2000 Agreement") with the Bricklayers and Allied Craft Workers Local 1 Massachusetts for work performed by the Defendant in the geographic area of the Local 1 union.

The 1989 Agreement references a collective bargaining agreement ("CBA") dated August 1, 1989 between the Bricklayers and Allied Craftsmen Eastern Massachusetts District Counsel Local Unions and the Building Trades Employers' Association of Boston and Eastern Massachusetts, Inc. and the Mason Contractors Association of Massachusetts, Inc. ("1989 CBA").[1]

The 2000 Agreement references a CBA dated September 1, 1992 ("1992 CBA") between the Bricklayers & Allied Craftsmen District Council of Western Massachusetts and the Building Trades Employers' Association of Boston and Eastern Massachusetts, Inc. and the Mason

---

[1]Independent agreements such as the 1989 Agreement and the 2000 Agreement are oft-times referred to as "hard card" or "me too" agreements and bind the parties thereto to the provisions of a separate agreement - typically a collective bargaining agreement. *See, e.g., Contempo Design Inc., v. Chicago and Northern Illinois District Counsel of Carpenters*, 189 F.3d 564 (7th Cir. 1999) , rev'd en banc, 226 F.3d 535 (7th Cir. 2000)

Contractors' Association of Massachusetts, Inc., as well as a CBA dated August 1, 1994 between

the Bricklayers and Allied Craft workers Local 1 Massachusetts and the Building Trades

Employers (Labor Policy Division) Construction Industry Association of Western Massachusetts,

Inc.[2]

Plaintiffs claim that the 1989 and 2000 Agreements bind the Defendant to the terms of

the 1989 CBA and 1992 CBA respectively, makes it a party thereto, and binds it to all successor

CBAs.  It is the Plaintiffs' position that two agreements signed on August 1, 2002 ("August 2002

CBA") and September 1, 2002 ("September 2002 CBA") are the ultimate successor agreements

to the 1989 CBA and the 2000 CBA.  Each of the later CBAs contains a traveling contractor's

clause which, according to the Plaintiffs, binds the Dick Corporation, when working outside of

the geographic area of the local CBA, to abide by the terms of the CBA in the work jurisdiction

or, if none exists, by the home CBA.  (Pl. Mot at 12-13.)

It is the Plaintiffs' contention that for work performed between January 2003 and October

2004 in the State of Florida, the Defendant was bound to the contemporaneous CBA between the

International Union of Bricklayers and Allied Craftsman ("BAC"), the Local No. 1 Florida of the

BAC, and signatory contractors ("Florida CBA").  Under the terms of the Florida CBA,

according to the Plaintiffs, the Defendant is required to make contributions to the IPF, the IMI,

the BAC, the FPF, the FHF, and the Local 1 App. Fund for all covered work performed by the

Defendant's employees, including any subcontractors' employees.

---

[2]Although the Plaintiffs make repeated references to a 1994 CBA, it was not produced by the
Plaintiffs in this case, is not a part of the record, and will not be considered by the Court.

## II.      DISCUSSION

Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to summary judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-50 (1986).  If a reasonable jury could find in favor of the non-movant, then a genuine issue for trial exists, and summary judgment is not appropriate.  *Id.*, 477 U.S. at 248.  In making this determination, the Court must resolve all factual ambiguities and draw all reasonable inferences in favor of the non-moving party.  *Id.*, at 255.  In this case, wherein cross-motions for summary judgment have been filed, the Court will draw all reasonable inferences regarding assertions made in a light most favorable to the non-asserting party.

### A.      Standing

This lawsuit is brought pursuant to ERISA § 502 (a), 29 U.S.C. § 1132 (a)(3), which authorizes fiduciaries to bring a claim for payment to an employee pension fund.  Under ERISA § 3 (21)(A), a "person is a fiduciary with respect to a plan to the extent (i) he exercised any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002.  Fiduciaries include, *inter alia*, trustees of the employer employee benefit plans, in this case, the Bricklayers & Trowel Trades International Pension Fund. *See* James F. Jorden &

4

Waldemar J. Pfepsen, Jr., & Stephen H. Goldberg, HANDBOOK ON ERISA LITIGATION §
3.02 [A] [2] (2nd ed. 2003).

Although the Plaintiffs have standing to sue under ERISA, they must still demonstrate a
constitutional 'injury' required under Article III. *Id.* at § 1.03, n.85; *See Warth v. Selden*, 422 U.S.
490, 501 (1975). To satisfy Article III, the Plaintiffs must first demonstrate an injury in fact – an
invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or
imminent, not conjectural or hypothetical. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560
(1992) Second, there must be a causal connection between the injury and the conduct complained
of - the injury has to be fairly traceable "to the challenged action of the defendant, and not ... the
result [of] the independent action of some third party not before the court." *Id., quoting Simon v.
Eastern Key Welfare Rights Organization*, 426 U.S. 26, 41-42 (1976). Third, it must be likely, as
opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.*, *See
Simon,* 426 U.S. at 38, 43; *See also Horvath v. Keystone Health Plan East, Inc.,* 333 F.3d 450
(3rd Cir. 2003).

Although the Article III standing inquiry clearly subsumes constitutional requirements, it
also imbues "prudential considerations." *Valley Forge Christian Coll. v. Am. United for
Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982); *See also Warth*, 422 U.S. at 498
(standing "involves both constitutional limitations on federal-court jurisdiction and prudential
limitations on its exercise"). Under Article III, "[t]he actual or threatened injury...may exist solely
by virtue of 'statutes creating legal rights, the invasion of which creates standing.'" *Warth*, 422
U.S. at 500, (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n. 3 (1973)); *see also Joint
Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 152 (1951) (Frankfurter, J., concurring)

("standing may be based on an interest created by the Constitution or a statute").  The prudential

considerations are subject to the limitations of Congress, which "may override prudential limits by

statute."  Erwin Chemerinsky, FEDERAL JURISDICTION § 2.3 (3rd ed. 1999); *see, e.g., Warth*,

422 U.S. at 501 ("Congress may grant an express right of action to persons who otherwise would

be barred by prudential standing rules"); *Sierra Club v. Morton*, 405 U.S. 727, 732 & n. 3 (1972).

ERISA clearly accomplishes this result. See 29 U.S.C. § 1132(a) (1988) (enumerating persons

empowered to bring a civil action under ERISA).  As written, Section 1132 empowers fiduciaries

to bring a civil action to redress any violation of the statute's fiduciary requirements.

This statutory grant of authorization for fiduciaries to bring suit satisfies the requirements

of Article III standing.  *See Fin. Inst. Ret. Fund v. Office of Thrift Supervision*, 964 F.2d 142 (2nd

Cir. 1992).


**B.     Venue**

ERISA § 502 (e)(2) states that venue is proper, *inter alia*, in the district where the plan is

administered. 19 U.S.C. § 1132. In this case it is not in dispute that the IPF is administered in the

District of Columbia.  Therefore, this court provides a proper venue for the present action.


**C.     ERISA § 515**

The Plaintiffs' claim is based on Section 515 of ERISA, which provides that:

Every employer who is obligated to make contributions to a multi employer plan
under the terms of the plan or under the terms of a collectively bargained
agreement shall, to the extent not inconsistent with law, make such contributions
in accordance with the terms and conditions of such plan or such agreement.

6

29 U.S.C. § 1145.

Under § 515, employee benefit plans are in a position superior to the original promisee, analogous to a holder in due course. *See Benson v. Brower's Moving & Storage Inc.*, 907 F.2d 310, 314 (2nd Cir. 1990). In determining whether a defendant is obligated to contribute to a pension plan, there are limitations to the defenses that a defendant may raise. *DeVitro v. Hempstead China Shop, Inc.,* 38 F.3d 651 (2nd Cir. 1994). Two defenses available to a defendant are that the agreement is not valid, or that it does not apply to the Defendant. *Id.*

Thus, to succeed in summary judgment, the Plaintiffs must demonstrate that a CBA creates an unambiguous contractual obligation on the Defendant to make contributions pursuant to the CBA, and that such contributions are consistent with ERISA and the Labor Management Relations Act ("LMRA").

### D.      Interpreting the Terms of the Independent Agreements and CBAs

#### *1.      1989 Agreement*

Under the terms of the 1989 Agreement, signed by the Defendant on December 1, 1989, the Defendant, "has read and hereby approved the signed Collective Bargaining Agreement, dated August 1, 1989," and has agreed "to be bound by all the terms and conditions of the effective Collective Bargaining agreement and any extensions, renewals, modifications or successor agreements." The Defendant questions the applicability of the 1989 CBA to the Defendant via the express terms of the 1989 Agreement, but offers no substantive argument in support of this position. (Def. Mot. at 3, "The 1989 Independent Agreement purports to bind Dick Corporation" to the 1989 CBA.)

From the plain language of the 1989 Agreement, the Defendant is "bound by," and is a "party to" the 1989 CBA.

### a.     1989 CBA

The 1989 Agreement provides that "[t]he life of the signed Independent Agreement is to be coexistent with the terms and conditions set out in the [1989 CBA] or as they shall be set out from time to time in any extensions, modifications or renewals of said Agreement."  This 'evergreen clause,' according to the Plaintiffs, prohibits the Defendant from terminating the 1989 Agreement except as consistent with the 1989 CBA or its successors.  (Raso Decl. ¶ 6, Ex. 7 to Dk't 25.)  The 1989 CBA states that "if neither party to this Agreement gives notice in writing to the other party on or before June 1, 1992 that it desires a change after August 1, 1992 then this Agreement will continue in effect until August 1, 1993 and so on each year thereafter unless on or before June 1 of each year thereafter a notice is given by either party."  (1989 CBA, Article XX, 'Expiration.')  No such written notice was provided by either party of their intention or desire to withdraw from the 1989 CBA.

### b.     August 2002 CBA

On August 1, 2002, a CBA was signed by local union signatories and Mason Contractors Association of Massachusetts.[3]  (*See* Raso Decl. ¶ 7.)  The Building Trades Employers' Association of Boston and Eastern Massachusetts, Inc., a signatory to the 1989 CBA, did not sign

---

[3]The ten Local Union signatories to the 1989 CBA were merged into six, representing the same six signatories to the August 1, 2002 CBA.

the August 2002 CBA.  Plaintiffs nevertheless contend that the August 2002 CBA is a

'successor' CBA to the 1989 CBA.  (Id. at ¶ 7.)  By its terms, the 1989 CBA will remain in effect

unless written notice is submitted by either party to the other that it "desires a change."  (*See*

1989 CBA, Art. XX, Sec. 1.)

      The Plaintiffs argue simply that the August 2002 CBA is a 'successor.'  The Court finds

several factors relevant in determining whether the August 2002 CBA is, indeed, a 'successor'

CBA to the 1989 CBA.  These factors include the signatories to the CBAs, the scope of

construction work covered by the CBAs, and the effective dates of the CBAs.  The CBAs at issue

here were essentially identical; the same local union is a party to both CBAs, the effective dates

of the CBAs are the same, and the scope of construction work and covered workers is the same.

The only relevant difference between the two CBAs is that the Building Trades Employers'

Association of Boston and Eastern Massachusetts, Inc., a party to the 1989 CBA, is not a party to

the August 2002 CBA.  Because the Defendant is not a member of the Building Trades

Employers' Association of Boston and Eastern Massachusetts, Inc., the Court need not determine

what impact the Defendant's membership in that association would have vis-a-vis whether the

August 2002 CBA is a 'successor' CBA.[4]

      The August 2002 CBA includes a traveling contractor's clause,  (August 2002 CBA,

Article X, Section 10), which the Plaintiffs argue binds the Defendant, "when working anywhere

outside the jurisdiction of the Local 3 and/or Local 1 MA Agreements, to abide by the terms of

---

[4]On May 3, 2005, the Court requested that the parties provide supplemental briefing as to
whether the Defendant was a member of the Building Trade Employer's Association.  (May 3, 2005
Order, [39].)  The parties timely responded and both indicated that the Defendant is not, nor has ever
been, a member of any association signatory to any CBA here at issue.  (May 13, 2005 Plaintiffs'
Supplemental Briefing [40], May 17, 2005 Defendant's Supplemental Briefing [42].)

any governing Bricklayers collective bargaining agreement existing in the work jurisdiction." (Pl. Motion at 5.)  For reasons set forth in footnote 7 herein, this Court finds that this traveling contractor's clause does not bind the Defendant as the Plaintiff suggests.

### 2.   2000 Independent Agreement

On September 16, 2000, the Defendant signed an Independent Agreement with the BAC Local 1 Massachusetts Union (2000 Agreement).  That agreement binds the Defendant to the terms of, and makes the Defendant a party to, a CBA dated September 1, 1992 (1992 CBA) and a CBA dated August 1, 1994.[5]

The Defendant argues that the clause binding the Defendant to the Florida CBA is invalid because it references a CBA not yet in existence.  In support of this position the Defendant argues that under well settled labor law, an instrument "may incorporate by reference only the terms of an instrument already in existence."  (Def. Mot. at 10, quoting *Fairfield*, 243 F.3d at 117).  In contrast, the Plaintiffs argue that the "undisputed evidence reveals that the Florida CBA did exist at the time that Dick Corporation signed the September Independent Agreement with BAC Local 1 MA in September 2000."  (Pl. Opposition at 10.)

Both parties focus their inquiry on whether the Florida CBA was in existence when the 2000 Agreement was signed.  The focus, however, is properly on whether the CBA referenced by the 2000 Agreement was in existence.  That CBA was the 1992 CBA (and by extension its successors).  A successor CBA to the 1992 CBA was in existence at the time the 2000

---

[5]As stated previously, the 1994 CBA has not been made a part of the record in this case.  It appears to the Court that the successor CBA to the 1992 CBA is a CBA that became effective on September 1, 1995 ("1995 CBA").  The 1995 CBA has been made part of the record in this case.

Agreement was signed, and the Defendant is therefore bound by its terms.

In agreeing to be bound by the 1992 CBA, the Dick Corporation, by operation of the 2000 Agreement, is bound by any successor CBAs to the 1992 CBA.[6]  On September 1, 1995, a successor CBA to the 1992 CBA became effective.  This 1995 CBA, was, in turn, replaced by a CBA which became effective on September 1, 1998 and expired on August 31, 2002 ("September 1998 CBA").  On September 1, 2002, a successor CBA to the September 1998 CBA became effective.  This September 2002 CBA is the successor CBA to the 1992 CBA upon which the Defendant was bound by operation of the 2000 Agreement.  The September 2002 CBA contains a traveling contractor's clause which, according to the Plaintiff, obligates the Defendant to make contributions consistent with the Florida CBA.  The traveling contractor's clause found in the September 2002 CBA differs substantively from the traveling contractor's clause found in the August 2002 CBA, and will thus be independently analyzed below.


TRAVELING CONTRACTOR'S CLAUSE

The traveling contractor's clause found in the September 2002 CBA states in relevant part, "[w]hen the employer has any work specified in Article XVI of this Agreement to be performed outside of the geographic area covered by an Agreement with another affiliate of the International [BAC], the Employer agrees to abide by the full terms and conditions of the Agreement in effect in the job site area."  (September 2002 CBA, Article I-D.)  This clause contains the word 'Agreement' three times.  The Court reads the clause as referencing three

---

[6]The 2000 Independent Agreement, in relevant part, provides that the Defendant "accepts and hereby becomes one of the parties [to the 1992 CBA] and agrees to be bound by all the terms and conditions of the [1992 CBA] and any extensions, renewals, modifications or successor agreements."

different agreements without expressly defining the scope of each.  The first reference ("this

Agreement") is to the actual Agreement containing the traveling contractor's clause, namely, the

September 2002 CBA.  The second referenced agreement is "an Agreement [be it a CBA or an

Independent Agreement between the Employer and] with another affiliate of the International

[BAC]," and would be the controlling agreement if the employer performs work outside of the

geographic area of the first (September 2002 CBA) but within the geographic area of the second

referenced agreement.  The third reference is to an agreement covering a geographic area where

no agreement exists between this employer and the BAC, but which exists between the BAC and

another employer ("the Agreement in effect in the job site").

        The Court finds that the traveling contractor's clause in the September 2002 CBA lacks

precision but is not ambiguous.[7]

---

        [7]By finding that the September 2002 CBA binds the defendant to any existing CBA in Florida,
discussed *supra*, the Court need not address whether the traveling contractor's clause in the August 2002
CBA binds the defendant to any existing CBA in Florida.  Nevertheless, because the traveling
contractor's clause found in the August 2002 CBA was fully briefed by the parties, and argued orally
before this Court, we will set forth an analysis of the distinction between the two clauses.
        The traveling contractor's clause found in the August 2002 CBA provides in relevant part,
"[w]hen the employer has any work specified in Article XVI of this Agreement to be performed outside
of the geographic area covered by this Agreement and *within the geographic area covered by an
Agreement with another affiliate* of [the BAC], the employer agrees to abide by the full terms and
conditions of the Agreement in effect in the job site area."  (August 2002 CBA, Article X, Section 10)
(emphasis added).  The Article also provides that "[i]f employees are sent to work on a project in an area
where there is no local Agreement covering the work specified in Article XVI of this Agreement, the full
terms and conditions of this Agreement shall apply."  (Id.)
        The Defendant urges the Court to interpret the traveling contractor's clause in the August 2002
CBA consistent with the opinion in *Trustees of the Bricklayers and Allied Craft Workers v. Driscoll
Masonry Restoration Co., Inc.*, 165 F. Supp. 2d 502 (S.D.N.Y. 2001).  In *Driscoll*, the employer had
signed a collective bargaining agreement with BAC Local 5 for work to be performed in that jurisdiction
and for a particular project.  The CBA in *Driscoll* contained a traveling contractor's clause substantively
identical to the clause presented in the August 2002 CBA.  Driscoll performed jobs in jurisdictions
outside of that covered by the CBA with Local 5, but within the jurisdiction of CBAs signed by *other
employers* and other BAC locals.  The plaintiff in that case requested contributions into the funds
specified in the job site CBA even though Driscoll had never signed those Agreements, and had
continually refused to do so.  The court concluded that the phrase "within the geographic area covered by

an Agreement with another affiliate" clearly and unambiguously applied only to CBAs signed by the employer (Driscoll) and the local affiliate.  *Id.* at 511.  As the court stated, "if Driscoll (the employer) does work as specified in Article IV (masonry) in an area of the state outside of Local 5's jurisdiction *where Driscoll has an agreement* with another BAC local (the other local), then Driscoll pays benefits in accordance with its agreement with the other local."  *Id.*, (emphasis added).

By contrast, the Plaintiffs here urge the Court to interpret the traveling contractor's clause found in the August 2002 CBA consistent with the holding in *Flynn v. Beeler Barney Associates Masonry Contractors, Inc.*, No. 02-1411, slip op. (D.D.C. August 8, 2004).  In *Flynn*, the court also considered a substantively identical traveling contractor's clause to that found in the August 2002 CBA and came to a contrary interpretation.  In *Flynn*, the plaintiff sued to recover contributions from *Beeler* in job sites in Georgia and Florida, even though *Beeler* was not a signatory to any CBA in either Georgia or Florida, but by virtue of a traveling contractor's clause that *Beeler* had signed in Oklahoma.  The court held that the traveling contractor's clause unambiguously applied in any jurisdiction in which *any contractor* has an agreement with a local affiliate in the job site jurisdiction.  *Id.* at 9-10.

*Driscoll* and *Beeler* both make reasonable, albeit opposite, interpretations of what both courts characterize as the "plain language" of the traveling contractor's clause. The traveling contractor's clause contained in the August 2002 CBA, which is substantively identical to the traveling contractor's clauses in both *Driscoll* and *Beeler*, is also susceptible to different albeit reasonable interpretations (as evinced by the opposite conclusions in those cases) and is therefore not unambiguous.  *See The Trustees of the B.A.C. Local 32 Ins. Fund v. Ohio Ceiling and Partition Co., Inc.*, 48 Fed. Appx. 188 (6th Cir. 2002) (holding that "[t]he phrase 'within the area covered by an agreement with another affiliate...could refer to an agreement between [the contractor] and the BAC affiliate, or it could refer to an agreement between any employer and the BAC affiliate").

*Driscoll*'s interpretation of the traveling contractor's clause is more persuasive because it is more reflective of the reasonably implied scope and purpose of collective bargaining agreements, it is not susceptible to anomalous results in its application (as is the *Beeler* interpretation), and it is a more limited construction – more reasonable in light of the ambiguity.  Each of these will be discussed below.

The Court interprets the August 2002 traveling contractor's clause in accordance with the general scope of the collective bargaining agreement in which it is found, namely, as a protection for the employee signatories to the CBA (via their representative local union).

In assessing *Driscoll* and *Beeler*, the court finds the more reasonable interpretation of the clause is to bind the employer to the terms of other CBAs that the employer has signed with other local BAC's when performing work in those jurisdictions. The *Driscoll* interpretation affords employees, covered by the CBA containing a traveling contractor's clause, and doing work for an employer in a jurisdiction outside of its home union jurisdiction, the protection of the terms of the job site CBA.  *See contra Beeler*, docket no. 02-1411 at p. 13 (finding that "it would make little sense to interpret the traveling contractor's clause as only applying when the employer does work in a jurisdiction where *that same employer* has signed a separate CBA with another BAC affiliate because, if the employer was [a] signatory to an agreement in the job site area, there would be no need for a traveling contractors clause.") (emphasis added).  The argument in *Beeler* fails to recognize the utility of the traveling contractor's clause in assuring that traveled employees receive the benefit of the job site CBA.  The traveling contractor's clause, as interpreted by *Driscoll*, is more beneficial to employees because in its absence, an employer could move employees to a different geographic location and undercut the local jurisdiction CBA's rates and benefits, by subjecting those traveled employees to their home state CBA, in a job site jurisdiction existing in a different employment market with different benefits.  The *Driscoll* interpretation of the traveling contractor's clause prevents that from happening.

By contrast, the *Beeler* interpretation of the same traveling contractor's clause imbues the clause with a panoptic scope. Under *Beeler*, an employer signatory to a CBA containing a traveling contractor's clause, when performing work in *any* other jurisdiction is bound to the terms of *any* existing CBA in that jurisdiction regardless of whether they have signed a local CBA, and regardless of the employees that they use. In support of this construction, the *Beeler* court invoked an expansive interpretation of the phrase "any work" in the clause, stating that the Defendant's argument is "discounted by the overt specification that the clause applies to 'any work' performed by the employer in an outside BAC jurisdiction. *Id.* at 10. The *Beeler* court's reliance on the phrase "any work" ignores the qualifications that immediately follow. "Any work," as used, is not synonymous with *all* work, as the *Beeler* court suggests, but merely includes *any* work *which is* (a) "to be performed outside of the geographic area covered by the agreement," and (b) within the geographic area covered by an Agreement with another affiliate. To read the phrase "any work" without considering the qualification that 'any' does not mean 'all' is an incomplete reading of the clause. The proper focus of the ambiguity, however, is not on the scope of the work performed, but on the particular 'agreement' referenced in the traveling contractor's clause. This Court is persuaded, for the reasons set forth herein, that the "agreement with another affiliate" referenced in the traveling contractor's clause, refers, as the other party to the agreement, to the particular employer. In short, the *Beeler* interpretation goes beyond the scope of protecting the employee signatories' interests.

The traveling contractor's clause, as interpreted by *Beeler*, can produce anomalous results. If the Dick Corporation had been a direct signatory to a previous CBA in Florida and provided written notice of its intent to withdraw from the CBA, under the *Beeler* construction of the traveling contractor's clause, it would nevertheless continue to be bound by the terms of a CBA signed by another employer. This interpretation obviates the need for local unions to negotiate with employer signatories to a foreign jurisdiction CBA containing a traveling contractor's clause, because that employer is, by fiat, already bound. Stated slightly differently, there would be little or no utility in an employer entering into a CBA in any jurisdiction after it has signed a CBA in another jurisdiction, which contained the traveling contractor's clause (assuming the *Beeler* construction), because regardless of whether it signed the CBA, it would nevertheless be bound by operation of the terms of the traveling contractor's clause in every other geographic location where the BAC had an extant CBA.

Under the traveling contractor's clause, as interpreted by *Driscoll*, employers who travel to a different jurisdiction, have no CBA with a union in that jurisdiction, and contract to do business with non-union labor, are not affected by the traveling contractor's clause. It is a more limited construction in that sense, but it still affords full protection to employees when they are required to travel to other jurisdictions, without subjecting the employer to a sweeping restriction on their ability to contract, or not contract, for union labor. "The first and best resort in the construction of contracts is to put oneself in the place of the parties at the time the contract was executed – to look at it in prospect rather than retrospect – for, when money disputes have arisen, the perspective is apt to be clouded by the unexpected chance of gain or self interest." *Long-Bell Lumber Co. v. National Bank of Commerce of Seattle*, 35 Wash.2d 522 (1950). Under the *Driscoll* interpretation, the local union employees are protected if they are traveled to another jurisdiction because they either receive the benefit of the job site CBA, or in the absence of an agreement with the employer in that jurisdiction, they benefit from their home CBA.

A traveling contractor's clause that provides a blanket restriction on an employer's ability to create independent state or local union specific collective bargaining agreements is not unusual. See Trustees of the Nat. Automatic Sprinkler Ind. Pension Fund v. Fairfield County Sprinkler Co., Inc., 243 F.3d 112 (2nd Cir. 2001) for a less ambiguous traveling contractor's clause. An employer may wish to cede such a bargaining ability. Nevertheless, in the absence of unambiguous language, the Court is

14

When performing work outside of the geographic area of the September 2002 CBA and outside

of the geographic area of any other CBA between this employer and the BAC, the employer will

be bound by "the full terms and conditions of the Agreement in effect at the job site." (September

2002 CBA, Article I-D.)

Thus, although the Court finds that the August 2002 CBA would not bind the Defendant

to the terms of an extant Florida CBA, the September 2002 CBA, by contrast, does.  If the

Florida CBA, relied upon by Plaintiff, is effective, the Defendant is bound via the September

2002 CBA, pursuant to the 2000 Agreement.

### E.    Is the Florida CBA Enforceable Against the Defendant Pursuant to the Labor Management Relations Act?

Between January 2003 and October 2004, the Defendant acted as a general contractor for

two construction projects in Florida.  As a general contractor, the Dick Corporation hired

subcontractors who in turn hired non-union employees to perform the construction work.  The

Dick Corporation is not a signatory to any CBA in Florida.  Nevertheless, under the terms of the

September 2002 CBA, the Defendant is bound to abide by the terms and conditions of a job site

---

unwilling to endow the clause with this broad construction.  The Court therefore construes the traveling contractor's clause as providing protection for the local union employees without thrusting upon the employer a restriction for all future labor bargaining in 49 other states and countless other local union jurisdictions.

Similarly, in light of the ambiguity, the Court favors the interpretation which renders the clause balanced, fair and reasonable to the one that renders it harsh and unreasonable to one party.  See RESTATEMENT (SECOND) OF CONTRACTS § 203 (a); See e.g., Joy v. City of St. Louis, 138 U.S. 1 (1891).  Absent clarity, the Court is unwilling to adopt the broad construction.

The Court finds that the traveling contractor's clause found in the August 2002 CBA does not bind the Defendant to any CBAs to which it is not a signatory.  The Plaintiffs' claim that the traveling contractor's clause contained in the August 2002 CBA is a vehicle binding the Defendant to the Florida CBA, is rejected.  However, the Court recognizes that the above analysis is dicta because although the Court concludes the Defendant would be bound by a Florida CBA under the September 2002 CBA, the Court also finds that a legally binding CBA did not exists at the job site.  See infra.

area CBA, regardless of whether the Defendant is a signatory to that agreement, and regardless of whether the employees performing the work are affiliated with a local union.  (September 2002 CBA, Article I-D.)  By engaging in work in Florida while bound by the CBA in Massachusetts, which contains an operable and unambiguous traveling contractor's clause, the Defendant is obligated to make contributions pursuant to a CBA that exists at the job site.

The Plaintiffs have supplied the Court with a document titled "Collective Bargaining Agreement Between BAC Local No. 1, Florida of the International Union of Bricklayers and Allied Craftsman and Signatory Contractors" ("Florida CBA").  (Att. to Ex.A to Pl. Mtn. for Summary judgement).  The Plaintiffs contend that this is the operable CBA and is applicable, pursuant to the traveling contractor's clause in the September 2002 CBA, to the Defendant.  The Florida CBA submitted to the Court is unsigned and does not have start and end dates.  The Defendant argues that the Florida CBA is unenforceable under the Labor Management Relations Act § 302(c)(5)(B), 29 U.S.C. § 185.  The Defendant makes three principal arguments in this regard.  First, the Defendant argues that the Florida CBA is not valid and enforceable.  Second, the Defendant claims that the LMRA prohibits contributions where, as here, no "detailed basis on which such payments are to be made is specified in a written agreement with the employer."  29 U.S.C. § 186 (c)(6); (Def. Mot. at 9.)  Third, the Defendant argues that because the contributions are not for the "sole and exclusive benefit of the Dick Corporation employees," the LMRA § 302 (c)(5)(A) prohibits the contributions.

1.      *"Agreement in Effect"*

The initial question to be addressed by the Court is whether there existed a valid CBA in effect at the job site.  Under the terms of the September 2002 CBA, the Defendant is obligated "to abide by the full terms and conditions of the *Agreement in effect* in the job site area."  (Article I-D.) (emphasis added).  The proffered Florida CBA, however, is not an agreement in effect, but is a standard form or draft agreement, completed and made enforceable only with the addition of an addendum detailing benefit payments and contractual ratification by real parties.  The Plaintiff argues that, "[b]ecause [the Florida CBA] is a standard contract for [Florida] and is renegotiated every two or three years, the details regarding such matters as contribution rates and the entities to which contributions shall be made are not inserted into the agreement *until BAC Local 1 FL reaches an agreement with an employer or employer group.*"  (Id. at 16-17, *emphasis added*, *citing* Blanco Decl. ¶¶ 3, 5.)

The Defendant argues that because the Florida CBA does not contain specific start and end dates, it is not a valid CBA. (Def. Mot. at 11.)  Under established labor law, which mimics in this instance well established contract law, a CBA is not effective and therefore is not binding until there exists a meeting of the minds.  *Interprint Co. and Graphic Arts Int'l. Union*, 273 N.L.R.B. 1863 (1985) (holding that because the CBA did not contain specific terms, there was no agreement between the parties under the terms of Section 8 to the National Labor Relations Act). The lack of the start and end date support the finding that the Florida CBA is not an actual, formalized agreement.

The Massachusetts CBAs, as discussed above, only bind the Defendant to an "Agreement in effect in the job site area."  (August 2002 CBA, September 2002 CBA.)   Until such time as

the local Florida union "reaches an agreement" (Pl. Opp'n at 17), there is no "Agreement in effect in the job site area," and therefore, no agreement upon which to bind this Defendant.

By design, therefore, the Florida CBA is not an agreement in effect (namely, a legally binding agreement), but merely provides a framework for one.

On this basis alone, the Defendant, by terms of the September 2002 CBA, is not bound by the Florida CBA.

2.      *"Detailed Basis"*

The Defendant's second argument is that the Florida CBA does not provide a detailed basis for contribution into the union fund and is thus prohibited by 29 U.S.C. § 186.  (Def. Mot. at 12.)  In opposition, the Plaintiffs argue that the Florida CBA does provide a detailed basis for the contributions sought from the employer.  (Pl. Opp'n at 16.)

Section 302 of ERISA prohibits employers from making contributions to various employee representatives.  *See* 29 U.S.C. § 186 (a).  This general prohibition, however, is subject to several exceptions.  One such exception provides that payments may be made by an employer into a trust fund if, *inter alia*, "the detailed basis on which such payments are to be made is specified in a written agreement with the employer." 29 U.S.C. § 186 (c)(6).

The Florida CBA provides that "the employer hereby agrees to contribute the amount set forth in the attached addendum, for each hour worked by employees within the geographic jurisdiction of the Agreement to the Florida Trowel Trades Pension Fund, Florida Trowel Trades Health & Welfare Fund and the Apprenticeship and Training Fund in the location of the work." (Florida CBA, Article XIX, Section 1.)  The *attached addendum* referenced in

18

Article XIX is not attached to the Florida CBA, submitted to the Court and is therefore not a part of the record in this case.

The Florida CBA, according to the Plaintiffs, is "the Standard Florida Contract used throughout the State of Florida, including the 2003-2004 period in which Dick Corporation worked in Miami and Tampa." (Pl. Opp'n at 16.) It is Plaintiffs' contention, however, that "[a]ll that matters for purposes of Section 302 (c)(5)'s detailed basis requirement is that the contract at issue did in fact set forth the detailed basis for the contributions." (Id. at 17.) Plaintiffs' own characterization of the Florida CBA, however, belies this assertion. According to the Plaintiffs, "[f]or areas such as Tampa [one area in which the Defendant performed work], where these terms can differ from those set forth in the contract, the *details regarding these terms* will be set forth instead on a separate Memorandum of Agreement which itself becomes part of the contract." (Pl. Opp'n at 17, *emphasis added*.) A detailed basis, therefore, is not provided in the Florida CBA, but would be attached as an addendum at the time an agreement is reached.

Because the Florida CBA is not, in fact, an executed or binding Agreement, it does not provide a detailed basis for contributions, and violates the 'detailed basis' requirement of § 302 (c)(5). The Defendant cannot be obligated to abide by its terms.

### 3.     *"Sole and Exclusive Benefit"*

The Defendant's third argument is that the benefit fund contributions sought by the Plaintiffs are not for the sole and exclusive benefit of *Dick Corporation's employees*. (Def. Mot at 12.) (emphasis added). Section 302 of the LRMA requires that the employer make contributions into a fund only if, *inter alia*, the trust fund was created for the "sole and exclusive

benefit of the employees of such employer, and their families and dependents...."  The Defendant

argues that because the work performed in Florida was done solely by employees of

subcontractors to Dick Corporation, rather than Dick Corporation employees, the benefit fund

contributions sought by the Plaintiffs are not for the sole and exclusive benefit of *Dick*

*Corporation's employees*.  (Def. Mot at 12.) (emphasis added)  In support of this position, the

Defendant cites both *Walsh v. Sclecht,* 429 U.S. 401 (1977) and *Trustees of the Nat'l Automatic*

*Sprinkler Industry Pension Fund v. Fairfield County Sprinkler Co., Inc.,* 243 F.3d 112 (2nd Cir.

2001).

In *Walsh*, the Court had to determine whether a contractor who had subcontracted work to

non-union employees was barred by the "sole and exclusive benefit" provision of the LRMA

from making contributions to the pension fund.  The Court held that the payments into the

pension fund for time worked by non-union employees did not violate § 302 because the

contributions were not being made on "'behalf of' or 'for the benefit of' the nonsignatory

contractor's ineligible employees, but solely for the benefit of the employees of the [contractor]

and other signatory employees."  *Id.* at 409.  A factual assumption underlying *Walsh* was that

there were eligible employees of the contractor who served to benefit from the contributions,

even though the contributions were being made based on the hours worked by ineligible

nonsignatory contractor workers.  *See Kreindler v. Clarise Sportswear Co.,* 184 F.Supp. 182

(S.D.N.Y. 1960).  As a contradistinction to the facts presented in *Walsh*, in this case, the

construction project here was staffed exclusively with the nonsignatory subcontractors' ineligible

non-union employees.  As such, the holding in *Walsh* can be distinguished and even supports the

opposite result in a case, such as this, in which there are no eligible signatory employers' [Dick

Corporation] employees. *See Maritas v. Carpet Linoleum Serv., Inc.*, 490 F.Supp. 369 (S.D.N.Y. 1980) (holding that "section 302(a)(1) by its terms prohibits enforcement of the subcontractors clause where no employee of the obligated employer is entitled to benefits.); *See also Seymour v. Hull & Moreland Eng'r*, 605 F.2d 1105, 1115 (9th Cir. 1979).

Any contributions made to the pension fund, measured by the hours performed by the subcontractors' employees, cannot be made "on behalf of" or "for the benefit of" any of the signatory employers' employees, as required by the statute.

**F.      Is Plaintiff subject to the Florida CBA Grievance and Arbitration Procedures?**

Assuming arguendo that the Defendant is bound by the terms and conditions of the Florida CBA, and therefore is obligated to make contributions in conformity therewith, the Defendant argues that the Plaintiff is procedurally barred from bringing this case because the Union failed to exhaust the grievance and arbitration procedure contained in Articles IV and V of the Florida CBA.  (Def. Opp'n at 11.)  In reply, the Plaintiff argues that the International Union is not a party to the Florida CBA, and therefore, is not bound by the grievance and arbitration procedures found therein.[8]

The Plaintiffs are not barred by the exhaustion provision of the grievance and arbitration procedures found in the Florida CBA for two reasons.  First, the Florida CBA, as stated above, is

---

[8]The Plaintiff would like to hold the Defendant to the onerous terms of the Florida CBA while simultaneously sidestepping those terms that might serve to protect or assist the Defendant.  It is precisely because the International Union is not a party to the agreement that its invocation by that non party is inherently troublesome.  Nevertheless, it appears that decisional law supports the Plaintiffs' standing to bring suit as a third-party beneficiary.  *See Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Serv., Inc.,* 870 F.2d 1148, 1151-54 (7th Cir. 1989).

not an agreement in effect, but is merely an unsigned boilerplate agreement which does not become effective "until BAC Local 1 FL reaches an agreement with an employer or employer group."  (Id. at 16-17, *emphasis added*, *citing* Blanco Decl. ¶¶ 3, 5.)  Second, even if the Florida CBA were a valid and enforceable agreement, pension funds are not required to exhaust collective bargaining agreement arbitration procedures prior to filing an action for collection of delinquent contributions.  *See* ERISA LITIGATION HANDBOOK, § 7.01[H], (Aspen 2004) (internal citations omitted)

### G.    Plaintiff's Alternative Argument

Plaintiffs, in the alternative, argue that if the Florida CBA is not applicable to the Defendant, which it is not, then the contributions are nevertheless still required under the terms of the September 2002 CBA.  (Pl. Opp'n at 15-16.)  The Plaintiff is incorrect for two reasons. First, the September 2002 CBA states that "[i]f *employees are sent* to work on a project in an area where there is no local Agreement covering the work specified in Article XVI of this Agreement, the full terms and conditions of this agreement shall apply."  (September 2002 CBA, Article I-D.)  This sentence, unambiguously, applies to employees who are traveled to a foreign project area.  In the case at hand, no employees were traveled to the Florida job site, and thus, that provision is not applicable.  Second, assuming that the provision did apply, which would make the September 2002 CBA applicable to the Defendant, its application to the Defendant in this case would violate § 302 of the LRMA because there were no eligible signatory employer employees on the job site.  *See supra* at II.E.3.

**III.**     **CONCLUSION**

For the foregoing reasons, the court Grants Defendant's motion for summary judgement and denies Plaintiff's motion for summary judgement.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued on this ___ day of July, 2005.

_____
ALAN KAY
UNITED STATES MAGISTRATE JUDGE