## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **JOHN FLYNN,** *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**DICK CORPORATION,**<br><br>Defendant. | Civil Action No. 03-1718 (AK) |

### MEMORANDUM OPINION

Pending before the Court are Plaintiffs' Application for Attorney's Fees [70] ("Pls.'

App."), Defendant Dick Corporation's Opposition [76] ("Def.'s Opp'n"), and Plaintiffs' Reply

[78] ("Pls.' Reply").

I.      **Background**

This case involves Plaintiffs' claim that Defendant Dick Corporation breached a

Collective Bargaining Agreement ("CBA") that was in effect at its Florida job sites by employing

non-union subcontractors.[1] (Mem. Op. [64] at 2.)  On June 16, 2008, the Court found "that there

is no genuine issue of material fact as to the existence of a CBA in effect at Dick Corporation's

Florida job sites such that the Fund is entitled to summary judgment." (*Id.* 7.)  Because Dick

Corporation did not dispute that it breached the CBA by employing non-union subcontractors,

the Court then calculated the damages that Dick Corporation owed to Plaintiffs on account of its

---

[1] For a more detailed recitation of the lengthy factual and procedural history of this case, see this Court's
June 16, 2008 Memorandum Opinion, and May 29, 2009 Memorandum Opinion.

1

breach.  (*Id.*)

Plaintiffs sought $1,893,737.71, representing $727,345.78 in delinquent contributions, $577,983.88 in interest, $577,983.88 in additional interest, $10,424.17 in expenses, and attorney's fees in an amount to be determined later pursuant to Section 502(g)(2) of the Employee Retirement Income Security Act of 1974 ("ERISA").[2]  (*Id.*)  To establish the amount of contributions that Plaintiffs would have received absent Dick Corporation's breach of the CBA[3], Plaintiffs submitted a declaration from Philip Vivirito ("Vivirito Decl."), an independent auditor who reviewed Dick Corporation's books and records.  (*Id.* 8.)  Mr. Vivirito examined the payroll records of Dick Corporations's subcontractors "to determine which employees of Dick Corporation and its subcontractors were performing [ ] work" covered by the CBA."  (3d Vivirito Decl. [59-5] ¶ 4.)  The payroll records allowed Mr. Vivirito to determine which employees were performing covered work because they "specifically indicated the type of work each employee

---

[2] Section 502(g)(2) provides:

In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title [requiring contributions under the terms of a CBA] in which a judgment in favor of the plan is awarded, the court shall award the plan --
    (A) the unpaid contributions,
    (B) interest on the unpaid contributions;
    (C) an amount equal to the greater of --
        (i) interest on the unpaid contributions, or
        (ii) liquidated damages provided for under the plan in an amount not in excess of
        20 percent (or such higher percentage as may be permitted under Federal or
        State law) of the amount determined by the court under subparagraph (A),
    (D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
    (E) such other legal or equitable relief as the court deems appropriate.

29 U.S.C. § 1132(g)(2).

[3] The Court of Appeals held that "[t]he Fund is entitled to damages resulting from the breach in the form of benefit contributions 'in a sum equal to that which they would have received if the agreement between the defendant and the union had been fully performed by all parties.'  *Flynn*, 481 F.3d at 832-33 (quoting *Trs. of the Teamsters Constr. Workers Local 13, Health & Welfare Trust Fund for Colo. v. Hawg N Action, Inc.*, 651 F.2d 1384, 1386-87 (10th Cir. 1981).

was performing by stating, next to each employees name, 'bricklayer,' 'laborer,' etc." (*Id*.)  For

one of Dick Corporation's subcontractors, Capform, Inc. ("Capform"), Dick Corporation failed

to provide Mr. Vivirito with certified payroll records, and accordingly Mr. Vivirito "did not have

information indicating the names of the employees who performed the work or the number of

hours that each employee worked in each of the various months covered by the audit." (*Id*. ¶ 7.)

Because Mr. Vivirito "only had the total number of man hours attributable to Capform, Inc.'s

subcontractors in Florida," Mr. Vivirito "included these hours in calculating the damages owed

by Dick Corporation by allocating them evenly to each month covered by the audit." (*Id*.)

Mr. Vivirito's "audit revealed that Dick Corp.'s subcontractors failed to report and remit

contributions for a total of 155,062 hours paid to its employees for bargaining unit work

performed under the Florida agreement." (Vivirito Decl. [61-4] ¶ 7.)  Using the contribution

rates set forth in the Blanco Declaration, Mr. Vivirito determined that Dick Corporation owed

delinquent contributions in the amount of $727,345.78.  (*Id*. ¶¶ 8-9.)  Mr. Vivirito also calculated

the amount of interest and additional interest that the Fund is entitled to recover under ERISA.

In accordance with the *Collection Procedures of the Central Collections Unit of the Bricklayer*

*and Allied Craftworkers* ("Collection Procedures"), Mr. Vivirito assessed interest on the

delinquent contribution at a rate of fifteen per cent per annum and determined that the total

interest due was $577,983.88.  (*Id*. ¶ 10.)  Mr. Vivirito also assessed additional interest in

accordance with the Collection Procedures at a rate of fifteen per cent per annum and determined

that Dick Corporation owed an additional $577,983.88 in interest.  (*Id*. ¶ 11.)  Based on these

calculations, Mr. Vivirito concluded that Dick Corporation owed a total of $1,155,967.76 in

interest and additional interest.  (*Id*. ¶ 13.)

Dick Corporation did not challenge Plaintiffs' claim for attorney's fees and costs or their entitlement to, or Mr. Vivirito's calculation of, interest and additional interest. (Mem. Op. [64] at 9.) Dick Corporation did, however, challenge Plaintiffs' calculation of delinquent contributions and argued that there were "significant disputed material facts regarding the quantum of contributions" such that a grant of summary judgment in favor of Plaintiffs on the issue of damages would be inappropriate. (*Id*.) Specifically, Dick Corporation asserted that there were disputes about "how much of the work subcontracted by Dick Corporation was covered by the Florida CBA's trade jurisdiction such that this subcontracting violated the Florida CBA." (Def.'s Br. [59] at 23.) In support of this contention, Dick Corporation submitted declarations that suggested that Mr. Vivirito improperly included work performed by employees of three subcontractors - ArtCrete & Restorations, Inc. ("ArtCrete"), Johnston & Simmons Concrete Placing and Finishing, Inc. ("Johnston"), and Capform, when computing the delinquent contributions owed to Plaintiffs. (Mem. Op. at 9.)

As to the work performed by ArtCrete, Dick Corporation submitted a declaration from Wilbert E. Fisher ("Fisher Decl."), Dick Corporation's General Superintendent on the Miami Federal Courthouse project. (Fisher Decl. [59-5] ¶ 1.) Mr. Fisher stated that "[e]mployees who perform the sort of concrete finishing work performed by ArtCrete & Restorations, Inc. on this project are represented in this geographic area by Operative Plasterers and Cement Masons International Union, rather than by the Bricklayers and Allied Craftworkers ("BAC"). (*Id*. ¶ 4.) As to the work performed by Capform's subcontractors on the Miami Federal Courthouse project, Mr. Fisher stated that employees who perform the rebar placement, concrete finishing, and concrete placement work performed by Capform's subcontractors are represented by unions

4

other than the BAC.  (*Id.* ¶¶ 5-7.)  Finally, as to the work performed by Johnston, Dick

Corporation submitted a declaration from Shelby J. Gardner ("Gardner Decl."), Dick

Corporation's Project Manager on the Fort Myers, Florida Midfield Terminal Expansion Project.

(Gardner Decl. ¶ 1.)  Mr. Gardner stated that the work performed by Johnston on this project was

limited to the placing and finishing of concrete slabs and related work and that employees who

perform this type of work are represented by unions other than the BAC.  (*Id.* ¶¶ 2, 4-5.)

     Applying the burden-shifting framework set forth in *Laborers' Pension Fund v. RES*

*Environmental Services, Inc.*, 377 F.3d 735 (7th Cir. 2004), the Court found that the "generalized

and conclusory allegations" in the Fisher and Gardner Declarations were insufficient to challenge

Mr. Vivirito's calculation of delinquent contributions.  (Mem. Op. [64] at 10-11.)  Accordingly,

the Court granted summary judgment for Plaintiffs on the issue of damages and ordered Dick

Corporation to pay the full $1,893,737.71 that Plaintiffs sought.  (*Id.* 11.)  On June 30, 2008,

Dick Corporation moved this Court to "alter and/or amend its June 16, 2008 judgment against

Dick Corporation to deny Plaintiffs' motion for summary judgment with respect to the damages

they seek, and order a damages trial."  (Def.'s Mem. Supp. Mot. [67] at 1.)  Dick Corporation

argued that by applying *Laborers' Pension Fund* and rejecting the Fisher and Gardner

Declarations, "the Court misapplied the law and misconstrued the record evidence in finding that

Dick Corporation did not raise a genuine dispute of material fact regarding the contributions to

which Plaintiffs are entitled."  (*Id.*)  Dick Corporation further argued that damages trial was

necessary to resolve the $1,314,175.80 factual dispute created by the Fisher and Gardner

Declarations.  (*Id.*)

     This Court reviewed the relevant legal standards and concluded that while it was correct

in holding that Dick Corporation failed to demonstrate a genuine issue of material fact as to the

calculation of damages for work performed by Capform's subcontractors, the Court's application

of evidentiary burden under *Laborers' Pension Fund* ArtCrete and Johnson was inappropriate in

light of the fact that there was no deficiency in payroll or other company records.  (Mem. Op.

[71] at 9.)  Without the heightened evidentiary burden, ArtCrete and Johnston needed only to

point to specific facts in the record to create a genuine issue of material fact for trial, and the

Court found that the Fisher and Gardner Declaration were sufficient in so doing.  (*Id.*)  As a

result, the Court ordered a damages triall on the issue of the amount of damages, if any, that Dick

Corporation must pay Plaintiffs for covered work performed by the two subcontractors.  (*Id.*)  On

the claims concerning Capform, however, the Court reasoned that Dick Corporation's failure to

provide Mr. Vivitrio with payroll records from Capform prevented him from accurately

determining the amount and type of work preformed under *Laborers Pension Fund*.  (*Id.* at 8.)  In

light of such a deficiency in records, the Court concluded that the burden fell on Dick

Corporation to introduce specific factual assertions to dispute Mr. Vivirito's calculations.  (*Id.*)

Because, as the Court found in its earlier Memorandum Opinion, the Fisher declaration, which

was offered by Dick Corporation as creating a genuine issue of material fact work performed by

Capform's subcontractors, contained the precise types of "generalized and conclusory

allegations" that were insufficient to prevent summary judgment in *Laborers' Pension Fund*, the

Court determined that it should not alter its earlier ruling with respect to Capform.  (*Id.* at 8-9.)

Dick Corporation subsequently moved for reconsideration and for leave to supplement

the record with the Capform subcontractors' certified payrolls, arguing, among other things, that

the interests of justice warranted allowing it to address the Capform subcontractor work at the

damages trial because it was previously unaware of the importance that would be attached to the

Capform subcontractor payrolls.  (Def.'s Mot. for Reconsideration [73] at 10-11.)  On May 29,

2009, this Court granted Dick Corporation's Motion for Reconsideration and for Leave to

Supplement the Record, and ordered a damages trial with respect to the work performed by three

subcontractors: ArtCrete & Restorations, Inc., Johnston & Simmons Concrete Placing and

Finishing, Inc., and Capform, Inc.  (Mem. Op. [80].)

Plaintiffs' Application for Attorney's Fees was filed on July 18, 2008 in response to this

Court's June 16, 2008 order granting summary judgment in favor of Plaintiffs.  (Pls.' App. [70]

at 1.)  That order required Plaintiffs to submit an application for attorney's fees in light of the

mandatory attorney fees provisions found in the Employee Retirement Income Security Act of

1974 ("ERISA").  *See* 29 U.S.C. § 1132(g)(2)(D).  In their application, Plaintiffs seek a total of

$471,840.42 in attorney's fees.  (Pls.' App. at 4.)  Dick Corporation filed an opposition to

Plaintiffs' application for attorney's fees, arguing that both the hourly rate charged and the time

spent claimed in the application are unreasonable.  (Def.'s Opp'n [76] at 1.)  Defendant

challenges the rates billed as claiming an improper enhancement for counsel's purported "public

spiritedness" representation of the Fund.  (*Id.* at 1-2.)  Furthermore, Defendant argues that the

application seeks an unreasonable amount of time to be compensated because the results to be

obtained in the case are yet undecided and because Defendant has not reviewed the actual legal

bills submitted to the fund.  (*Id.*)  Finally, Defendant asserts that the application for attorney's

fees is premature given the procedural posture of the case and the forthcoming damages trial, and

the issue should be deferred until the litigation is concluded.  (*Id.* at 2, 14.)  In their Reply,

Plaintiffs respond that "the possibility of a future damages hearing does not preclude this Court

from deciding . . . nearly all the issues raised by Plaintiffs' Application for Attorney's Fees, such

as whether (i) the Plaintiffs are entitled to recover market or discounted rate fees, (ii) the market

rates of Dickstein Shapiro are reasonable, and (iii) the hours billed by Dickstein Shapiro up

through the date of the application for attorney's fees are reasonable and appropriate."  (Pls.'

Reply [78] at 7.)


II.    **Legal Standards**

ERISA provides for the mandatory award of reasonable attorney's fees in a successful

action to enforce an employer's obligation to make contributions to a multi-employer plan:  "the

court shall award the plan . . . (D) reasonable attorney's fees and costs of the action, to be paid by

the defendant."  29 U.S.C.  §1132(g)(2)(D).  "The usual method of calculating reasonable

attorney's fees is to multiply the hours reasonably expended in the litigation by a reasonable

hourly fee, producing the 'lodestar' amount."  *Board of Trustees of Hotel and Restaurant*

*Employees Local 25 and Employers' Health and Welfare Fund v. JPR, Inc.*, 136 F.3d 794, 801

(D.C. Cir. 1998) ("*JPR*"); *see Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*,

478 U.S. 546, 564 (1986).  "This amount may then be adjusted by a muliplier in certain rare and

exceptional cases, though there is a strong presumption that the lodestar figure . . . represents a

reasonable fee."  *JPR*, 136 F.3d at 801 (citations omitted).  The lodestar method requires the fee

applicant to demonstrate the reasonableness of the hourly fee by establishing (1) the attorney's

skill, experience, reputation, and the complexity of the case they handled, and (2) the prevailing

market rates in the community.  *Covington v. District of Columbia*, 57 F.3d 1101, 1107 (D.C.

Cir. 1995); *see also Bd. of Trustees of the Hotel and Restaurant Employees Local 15 and*

*Employers' Health and Welfare Fund v. The Madison Hotel, Inc.*, 43 F. Supp. 2d 8, 12 (D.D.C.

1999).

III.   **Discussion**

A.   Public-Spiritedness

In this Circuit, the reasonable hourly fee under Section 1132(g)(2) may be set at market

rates if the fees actually paid by the client were discounted for public spirited reasons. *JPR*, 136

F.3d at 801, 806 ("the policies underlying section 1132(g)(2) support an allowance . . . of fees at

market rates, assuming the fees actually paid were discounted for public-spirited reasons").  In

exercising its "sound discretion" in determining whether an attorney has a public-spirited reason

for representation, a court is guided by whether the fee charged in fact differs significantly from

the market value of the attorney's services and whether a showing has been made that public-

spiritedness was a principal, though not necessarily the only, reason for the discount.  *Id.* at 807.

Plaintiffs have sufficiently demonstrated the public spiritedness of Dickstein Shapiro's

discounted fees for its representation of the Fund.  In support of its application for fees, Plaintiffs

submitted a detailed declaration that describes Dickstein Shapiro's long history of representing

labor organizations and multiemployer funds and the public-spirited reasons for providing such

organizations, including Plaintiffs, with representation at a discounted rate.  (*See* Declaration of

Ira R. Mitzner, Pls.' App. Ex. C. ("Mitzner Decl.").)  For example, the declaration discusses the

firm's desire to provide the best representation to the Fund in order to collect delinquencies in

often complex EIRSA cases and to create favorable precedent to protect plans and beneficiaries,

while at the same time mitigating financial hardships to the Fund.  (*Id.* ¶ 7.)  The Court finds no

reason here to second guess the reasons for the discount proffered by Dickstein Shapiro.  *See,*

*JPR*, 136 F.3d at 807 ("[a]s officers of the court, attorneys will presumably not be inclined to

misrepresent their reasons for granting a discount").  Despite the clear economic motivation that

must accompany the prospect of any firm receiving market value payment for its legal services,

Dicktein Shapiro has sufficiently demonstrated that its discounted fee structure was based, at

least in principal part, on public-spirited motivations.  *See id.* ("the presence of other [economic]

motivations need not vitiate an attorney's public-spiritedness").

　　　　The Court declines to read into *JPR* the requirement, as Dick Corporation urges, that a

fund be small, local, or nearly insolvent before the award of market rate fees will be permitted for

an asserted public-spirited fee discount.  (*See* Def.'s Opp'n at 7-10.)  While the Court of Appeals

discussed Congress' goal of keeping plans solvent as one of the justifications for allowing funds

to recover market rate fees, it did not suggest that the solvency of a particular fund would impact

a court's analysis of the public-spirited discount it received.  *See JPR*, 136 F.3d at 803-06

(concluding that the policies underlying Section 1132(g)(2) support the allowance of market rate

fees).  Indeed, the Court of Appeals did not cite the size, scope, or financial status of the fund as

factors to be considered in the public-spiritedness determination.  *See id.* at 806-07 (providing

guiding principals of law for determining whether fees were discounted for public spirited

reasons).

　　B.　　<u>Reasonableness of the Rates Sought</u>

　　　　With market rates as the appropriate benchmark, the Court must now determine whether

Dickstein Shapiro's market rates are reasonable in light of (1) the attorney's skill, experience,

reputation, and the complexity of the case they handled, and (2) the prevailing market rates in the community. *Covington*, 57 F.3d at 1107.  "An attorney's usual billing rate, when in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation, is presumptively reasonable." *Adolph Coors Co. v. Truck Insurance Exchange*, 383 F. Supp. 2d 93, 97 (D.D.C. 2005) (citations omitted).

Plaintiffs' application for attorney's fees and the supporting declaration set forth detailed information on the skills and experience of the attorneys that worked on this case.  (*See* Pls.' App. at 27; Mitzner Decl. ¶¶ 4-5, 35-42.)  The rates charged reflect the standard rates charged to clients of Dickstein Shapiro during the relevant time period, and are consistent with the Updated Laffey Matrix.  (*See* Pls.' App. at 14, 27; Pls.' App. Ex. 6; Mitzner Decl. ¶ 17, 44-47.)  Because "the actual rate that applicant's counsel can command in the market is itself highly relevant proof of the prevailing community rate," *Nat'l Assoc. of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319 1326 (D.C. Cir. 1982), the Court finds that Plaintiffs have demonstrated that the rates sought by Plaintiffs' counsel are reasonable.

C.     Reasonableness of the Hours Claimed and Final Calculation of Attorney's Fees

Defendant urges this Court to defer consideration of the amount of time to be compensated because of the procedural posture of the case and because Defendant has not yet received, and therefore has been unable to review, the actual invoices paid by the Fund.  (*See* Def.'s Opp'n at 12.)  In light of the procedural posture of the case and the forthcoming damages trial with respect to the work of three subcontractors, the Court will defer the issue of the reasonableness of the number of hours claimed until the close of the litigation.  This will permit

Defendant to fully review the documentation supporting the hours claimed by Dickstein Shapiro

and will allow the Court to review a complete application for attorneys fees at a more appropriate

time.

**IV.**    **Conclusion**

An Order consistent with this Memorandum Opinion is filed contemporaneously

herewith.

Date: June  12th , 2009                          _____/s/_____

ALAN KAY
UNITED STATES MAGISTRATE JUDGE